# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

_____

|  |  |  |
|---|---|---|
| ERICA L. LUNSFORD and TERRY L. LUNSFORD, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE NO. |
| v. | ) ) | 1:12-cv-103-CAP |
| WOODFOREST NATIONAL BANK and WOODFOREST BANK, | ) ) ) ) | |
| Defendants. | ) ) | |

_____)

## ORDER OF FINAL APPROVAL OF SETTLEMENT, AUTHORIZING SERVICE AWARDS, AND GRANTING APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

On March 31, 2014, Plaintiffs Erica L. Lunsford and Terry L. Lunsford and Class Counsel filed their Motion for Final Approval of Class Settlement, Application for Service Awards, and Application for Attorneys' Fees and Expenses ("Motion"), seeking Final Approval of the Amended Settlement Agreement and Release ("Settlement" or "Amended Agreement") with Woodforest National Bank and Woodforest Bank (collectively "Woodforest" or the "Bank"). See Dkt. No. 81. In support, Plaintiffs filed declarations from Class Counsel and an expert in class action law and attorneys' fees, as well as from Staci Nesbit and Jeffrey Dahl

supplementing the factual record to assist the Court's evaluation of the fairness and adequacy of the Settlement.  See Dkt. Nos. 81-2, 81-3, 81-4, 81-5.[1]

This matter came before the Court on May 19, 2014, for a Final Approval Hearing pursuant to the Court's Preliminary Approval Order dated December 31, 2013.  See Dkt. No. 75.  The Court reviewed all of the filings related to the Settlement and heard argument on the Motion.

After careful consideration of the presentations of the Parties, the Court concludes that this Settlement provides a fair, reasonable, and adequate recovery for Settlement Class Members, which Class Counsel believes represents approximately forty-nine percent (49.0%) of the most probable amount of recoverable damages based on the creation of a $7,750,000 common fund.  The Settlement constitutes an excellent result for the Settlement Class under the circumstances and challenges presented by the Action.  The Court specifically finds that the Settlement is fair, reasonable, and adequate, and a satisfactory compromise of the Settlement Class Members' claims.  The Settlement fully complies with Fed. R. Civ. P. 23(e) and, thus, the Court grants Final Approval to the Settlement, certifies the Settlement Class, and awards the fees and costs

---

[1] As used in this Order, capitalized terms shall have the definitions and meanings accorded to them in the Settlement.

requested by Class Counsel as well as the requested Service Awards for the Class Representatives.

## BACKGROUND

The present evidentiary record is more than adequate for the Court to consider the fairness, reasonableness, and adequacy of the Settlement. A fundamental question is whether the district judge has sufficient facts before him to evaluate and intelligently and knowledgeably approve or disapprove the settlement. In re General Tire & Rubber Co. Sec. Litig., 726 F.2d 1075, 1084 n.6 (6th Cir. 1984) (citing Detroit v. Grinnell, 495 F.2d 448, 463-68 (2d Cir. 1974)). In this case, the Court clearly has such facts before it in considering the Motion, including the evidence and opinions of Class Counsel; an expert; a leading class action settlement administration company, Rust Consulting; and Dahl Administration, who handled the published notice program.

### A.   Factual and Procedural Background.

On January 11, 2012, Plaintiffs Erica L. Lunsford and Terry L. Lunsford filed a Class Action Complaint in this Court seeking monetary damages, restitution, and declaratory relief from Woodforest, arising from the alleged unfair assessment, collection, and disclosure of overdraft fees, styled Lunsford v. Woodforest National Bank, *et al.*.

On March 9, 2012, Woodforest moved to dismiss the Complaint and to strike the class allegations made therein. See Dkt. No. 8. On April 16, 2012, Plaintiffs filed their response in opposition to Woodforest's motion to dismiss and strike class allegations. See Dkt. No. 24. On May 17, 2012, Woodforest filed its reply brief in further support of its motion to dismiss and strike class allegations. See Dkt. No. 27.

While Woodforest's motion to dismiss and strike class allegations was pending, Plaintiffs filed notices of supplemental authority in opposition to Defendants' pending motions. See Dkt. Nos. 28, 33. On March 12, 2013, the Court issued an order denying the motion to dismiss and motion to strike filed by Woodforest. See Dkt. No. 35. On April 16, 2013, Woodforest filed its Answer and Affirmative Defenses to the Complaint. See Dkt. No. 44.

On April 18, 2013, the Parties filed their Joint Preliminary Report and Discovery Plan, which was amended and adopted by the Court on April 24, 2013. See Dkt. Nos. 45, 46. On April 30, 2013, Plaintiffs served their first request for production of documents, first set of interrogatories, and first requests for admissions on Woodforest. On May 15, 2013, the Parties filed their proposed Stipulated Confidentiality Order relating to the production of documents and information. See Dkt. No. 52.

On May 16, 2013, Woodforest served its first request for production of documents and first set of interrogatories on Plaintiffs. On May 16, 2013, the Parties exchanged their initial disclosures. See Dkt. Nos. 53, 54. On June 21, 2013, the Parties served their respective responses to discovery.

On July 11, 2013, the Parties filed their Stipulated Discovery Plan and Proposed Order for Electronically Stored Information (Dkt. No. 58), which the Court adopted on July 12, 2013. See Dkt. No. 59. On September 5, 2013, the Court adopted in part, and amended in part, the Parties' Stipulated Confidentiality Order. See Dkt. No. 63. Woodforest produced to Plaintiffs over 79,000 pages of documents related to Plaintiffs' claims which have been reviewed by counsel for Plaintiffs. See Joint Declaration of E. Adam Webb and G. Franklin Lemond, Jr., ¶ 23 (Dkt. No. 81-2) ("Joint Decl.").

Class Counsel's review of the discovery enabled Plaintiffs to gain an understanding of the evidence related to central questions in the case, and the strengths and weaknesses of the case. See Joint Decl. ¶ 24. Class Counsel's review of the documents produced by Woodforest also assisted Plaintiffs in understanding some of Woodforest's unique Debit Re-sequencing Overdraft Practices. Id. at ¶ 25. Furthermore, Class Counsel's review of the documents

produced by Woodforest also prepared Plaintiffs to engage in well-informed settlement negotiations. Id. at ¶ 26.

Beginning in October 2013, the Parties began preliminary settlement discussions. See Joint Decl. ¶ 27. Woodforest provided Class Counsel with sample transactional data regarding its overdraft fee revenue. Woodforest also provided aggregate information regarding its total overdraft fees during all months of the relevant time period. Id. at ¶ 28. Using the extensive transactional data provided for six randomly selected months during the class period, Class Counsel worked with Plaintiffs' expert, Arthur Olsen of Cassis Technology, LLC, to first determine what percentage of the total overdraft fees generated by Woodforest were attributable to the Bank's Debit Re-sequencing Overdraft Practices. Id. at ¶ 29.

After determining what percentage of overdraft fees were allegedly wrongful using the sample transactional data, Class Counsel and Mr. Olsen applied this percentage to the aggregate information regarding Woodforest's total overdraft fee revenue during all months of the relevant time period. See Joint Decl. ¶ 30. This calculation allowed Mr. Olsen to determine the amount of damages that were allegedly suffered by the Settlement Class as a result of Woodforest's Debit Re-sequencing Overdraft Practices. Id. at ¶ 31. Prior to sitting down for a formal

mediation, the Parties and their experts participated in several group conference calls to ensure that both sides went into the mediation session "on the same page" with respect to the class-wide damages analysis. Id. at ¶ 32. The data-crunching and analysis in preparation for mediation was an enormous task given the millions of customer transactions that were involved and the numerous internal codes of the Bank. Id.

On November 21, 2013, the Parties participated in a formal mediation session in New Orleans under the auspices of Mediator Anthony M. DiLeo, Esq.. The mediation lasted from 9 a.m. until 7 p.m. As a result of the mediation, the Parties agreed to a settlement framework that established the Parties' good faith intention to fully, finally, and forever resolve, discharge, and release all rights and claims of the Settlement Class Members. See Joint Decl. ¶¶ 33-34. At all times throughout the mediation proceedings and subsequent settlement discussions, the negotiations were adversarial, non-collusive, and at arm's-length. Id. at ¶ 35.

While the Parties reduced the settlement framework into the written Settlement Agreement, Class Counsel prepared the motion for preliminary approval, memorandum of law in support, along with the sample notices and proposed order. See Joint Decl. ¶ 36. On December 20, 2013, Class Counsel filed the Motion for Preliminary Approval. Id. at ¶ 37. On December 31, 2013, this

Court entered an Order granting preliminary approval to the Settlement, certifying the Settlement Class, and scheduling a final approval hearing for May 19, 2014. Id.

In January 2014, Plaintiffs and Defendants executed an Amended Settlement Agreement that did not alter the principal economic terms of the Settlement. See Joint Decl. ¶ 38. On January 30, 2014, Plaintiffs and Defendants filed their Joint Motion for Preliminary Approval of Amended Settlement Agreement. See Dkt. No. 76. This Court approved the Amended Settlement Agreement on January 31, 2014. See Dkt. No. 77.

On February 24, 2014, Timothy and Julie Darling submitted a letter to the Court regarding this Settlement. See Dkt. No. 78. Because the Darlings' letter does not object to any aspect of the Settlement and does not contain the information which this Court previously ordered must accompany objections (Preliminary Approval Order, ¶ 30), the Court does not construe the letter as an objection to the Settlement. Indeed, no objections to the Settlement have been filed.

### B.      Summary of the Settlement Terms.

The Settlement's terms are detailed in the Amended Agreement. See Dkt. No. 81-1. The following is a summary of the material terms of the Settlement.

### 1.    The Settlement Class.

The Settlement Class is an opt out class under Rule 23(b)(3) of the Federal

Rule of Civil Procedure.  The Settlement Class is defined as:

> [A]ll holders of any Woodforest Account in the United States who, during the Class Period, incurred one or more Overdraft Fees in connection with Woodforest's Debit Re-sequencing Overdraft Practices.

Amended Agreement ¶ 51.  Excluded from the Class are all current Woodforest

employees, officers, and directors, and myself as the judge presiding over this

Action.

### 2.    Monetary Relief for the Class.

Under the Settlement, Woodforest deposited $7.75 million into an Escrow

Account.  Amended Agreement ¶ 56.  That deposit created the Settlement Fund

that will be used to pay: (i) all distributions of money to the Settlement Class; (ii)

any Court-ordered award of attorneys' fees, costs, and expenses of Class Counsel;

(iii) any Court-ordered Service Awards to Plaintiffs;(iv) any expenses resulting

from investment of the Settlement Fund; (v) invoices of the Tax Administrator,

subject to approval of Class Counsel and Woodforest; (vi) any Taxes; (vii)

additional fees, costs, and expenses not specifically enumerated in the Amended

Agreement, subject to approval of Class Counsel and Woodforest; and (viii) any

residual distributions.  Amended Agreement ¶ 62.  In addition to the $7.75 million

Settlement Fund, Woodforest is responsible for paying all costs and fees associated with Class Notice and administration of the Settlement.  Id. at ¶¶ 57, 63.

All identifiable Settlement Class Members who incurred a Positive Differential Overdraft Fee will receive *pro rata* distributions from the Net Settlement Fund, provided they did not opt out of the Settlement.  See Amended Agreement Section XIII.  The Differential Overdraft Fee analysis determines, among other things, which Woodforest Account Holders were assessed additional Overdraft Fees that would not have been assessed if the Bank had used a posting sequence or method for posting Debit Card Transactions other than Debit Re-sequencing, and how much in additional Overdraft Fees those Account Holders paid as a result of Debt Re-sequencing.  The calculation involves a multi-step process that is described in detail in the Amended Agreement.  Id. at ¶¶ 87-88. Settlement Class Members do ***not*** have to submit claims or take any other affirmative step to receive relief under the Settlement.  The amount of their *pro rata* distributions is determined by Class Counsel and their expert through analysis of Woodforest's electronic data.  Id.

The Net Settlement Fund – which will be distributed *pro rata* among all Settlement Class Members who incurred a Positive Differential Overdraft Fee– is equal to the Settlement Fund, plus interest earned (if any), less Court-awarded

attorneys' fees and costs, Service Awards for the Plaintiffs, any Taxes, and any other expenses and costs, as described in the Amended Agreement at ¶ 89.

Within 30 days after the Effective Date (defined in the Amended Agreement at ¶ 31), Woodforest and the Settlement Administrator will distribute the Net Settlement Fund to all eligible Settlement Class Members who did not timely opt out of the Settlement and who are entitled to a distribution. Id. at ¶ 90.

Payments to eligible Settlement Class Members who are Current Account Holders will be made, to the extent feasible, by the Bank crediting such Settlement Class Members' Accounts, and notifying them of the credit. Amended Agreement ¶ 94. Woodforest will then be entitled to a reimbursement for such account credits from the Settlement Fund. Id. Former Account Holders and Current Account Holders whose Accounts cannot feasibly be automatically credited, will receive payments from the Settlement Fund by checks mailed by the Settlement Administrator. Id. at ¶¶ 94, 96.

Any uncashed or returned checks will remain in the Settlement Fund for one year from the date the first distribution check is mailed by the Settlement Administrator, during which time the Settlement Administrator will make reasonable efforts to effectuate delivery of the Settlement Fund Payments.

11

Amended Agreement ¶ 98.  Any monies remaining in the Settlement Fund after one year shall be disbursed according to Section XIV of the Amended Agreement.

### 3.    Class Release.

In exchange for the benefits conferred by the Settlement, all Settlement Class Members who did not timely opt out will be deemed to have released Woodforest from claims related to the subject matter of the Action.  The detailed release language can be found in Section XVI of the Amended Agreement.

### DISCUSSION

The federal courts have long recognized a strong policy and presumption in favor of class settlements.  The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement."  In re Chicken Antitrust Litig. Am. Poultry, 669 F.2d 228, 238 (5th Cir. Unit B 1982).  In evaluating a proposed class settlement, the Court "will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'"  Rankin v. Rots, 2006 WL 1876538, at *3 (E.D. Mich. June 28, 2006) (quoting Zerkle v. Cleveland-Cliffs Iron Co., 52 F.R.D. 151, 159 (S.D.N.Y. 1971)).  Indeed, "[s]ettlement agreements are highly favored in the law and will be upheld whenever possible because they

12

are a means of amicably resolving doubts and uncertainties and preventing lawsuits." In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1105 (5th Cir. 1977). Class settlements minimize the litigation expenses of the parties and reduce the strain that litigation imposes upon already scarce judicial resources. Therefore, "federal courts naturally favor the settlement of class action litigation." Isby v. Bayh, 75 F.3d 1191, 1196 (7th Cir. 1996).

As explained below, the Settlement here is more than sufficient under Rule 23(e). It includes a Settlement Fund of $7,750,000, plus the payment of the fees and costs associated with the Notice Program and Settlement administration by Woodforest. Amended Agreement ¶¶ 57, 63. Settlement Class Members will receive their recovery as a matter of course, without needing to take any action, based on an analysis by experts of the account data in Woodforest's possession. Id. at ¶ 94.

## A. The Court Has Personal Jurisdiction Over the Settlement Class Because Settlement Class Members Received Adequate Notice and Had an Opportunity to Be Heard.

In addition to having personal jurisdiction over Plaintiffs, who are parties to this Action, the Court also has personal jurisdiction over all members of the Settlement Class because they received the requisite notice and due process. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12 (1985) (citing Mullane v.

Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950)); see also In re

Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 306 (3d Cir. 1998),

cert. denied, 525 U.S. 1114 (1999).

### 1.    The Best Notice Practicable Was Furnished.

The Notice Program was comprised of three parts: (1) direct mail postcard

notice ("Mailed Notice") to all identifiable Settlement Class Members; (2)

publication notice ("Published Notice") designed to reach those Settlement Class

Members for whom direct mail notice was not possible; and (3) a "Long-Form"

notice, with more detail than the direct mail or publication notices, that has been

available on the Settlement Website and via mail upon request.    Amended

Agreement, Section X.

Each facet of the Notice Program was timely and properly accomplished.

See Affidavit of Staci Nesbit, ¶¶ 5-12 (Dkt. No. 81-4) ("Nesbit Aff."); Affidavit of

Jeffrey Dahl, ¶ 7 (Dkt. No. 81-5) ("Dahl Aff."); Joint Decl. ¶¶ 56, 58.    The

Settlement Administrator received the data files that identified the names and last

known addresses of all identifiable Settlement Class Members, ran the addresses

through the National Change of Address Database, and mailed postcards to

231,942 Settlement Class Members.    Nesbit Aff. ¶¶ 7-12.    The Mailed Notice

Program was timely completed.    Id.  The Published Notice Program was completed

14

through advertisements in the following newspapers, which include the geographic areas where more than 80% of relevant accounts were located:  the *Dallas Morning News*, the *Houston Chronicle*, the *San Antonio Express-News*, the *Austin American-Statesman,* the *Cleveland Plain Dealer,* the *Columbus Dispatch*, the *Virginian-Pilot*, the *Richmond Times-Dispatch*, the *Charlotte Observer*, the *Raleigh News & Observer*, the *Atlanta Journal Constitution*, and the *Augusta Chronicle*.  Dahl Aff. ¶ 7; Joint Decl. ¶ 58.  The published notice program also included online notice targeted to all 17 states where Woodforest maintains branches, with the goal of generating approximately six million impressions, including (a) online banner ads targeting users by state, zip code, interest, and age, with a duration of four weeks and (b) key word searches on Google and Bing targeting users by state, zip code, interest, and age.  Dahl Aff. ¶¶ 8-14; Joint Decl. ¶ 58.  The Settlement Website with a "Long-Form" notice was established to enable Settlement Class Members to obtain detailed information about the Action and the Settlement.  Nesbit Aff. ¶ 5.  As of March 20, 2014, the Settlement Website had over 10,000 unique visitors.  Id.

In addition, a toll free number has been operational since February 10, 2014.  Nesbit Aff. ¶ 6.  By calling this number, Settlement Class Members can listen to answers to frequently asked questions and request a copy of the Long-Form

Notice.  Id.  As of March 20, 2014, the toll free number has handled over 4,631 calls.  Id.

### 2.    The Notice Was Reasonably Calculated to Inform Settlement  Class Members of Their Rights.

The Court-approved Notice satisfied due process requirements because it described "the substantive claims . . . [and] contain[ed] information reasonably necessary to make a decision to remain a class member and be bound by the final judgment." In re Nissan Motor Corp. Antitrust Litig., 552 F.2d 1088, 1104-05 (5th Cir. 1977).  The Notice, among other things, defined the Settlement Class, described the release provided to Woodforest under the Settlement as well as the amount and proposed distribution of the Settlement proceeds, and informed Settlement Class Members of their right to opt out and object, the procedures for doing so, and the time and place of the Final Approval Hearing.  It also notified Settlement Class Members that a class judgment would bind them unless they opted out, and told them where they could get more information – for example, at the website that posts a copy of the Amended Agreement, as well as other important court documents.  Further, the Notice described Class Counsel's intention to seek attorneys' fees of thirty-three percent (33%) of the $7,750,000 Settlement Fund.

The Court finds the Notice was "reasonably calculated, under [the] circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Shutts, 472 U.S. at 812 (quoting Mullane, 339 U.S. at 314-15).  This Settlement was widely publicized, and any Settlement Class Member who wished to express comments or objections had ample opportunity to do so.

**B.** **The Settlement Is Fair, Adequate, and Reasonable, and Therefore Is Finally Approved Under Rule 23.**

In deciding whether to approve the Settlement, the Court will analyze whether it is "fair, adequate, reasonable, and not the product of collusion." Leverso v. Southtrust Bank, 18 F.3d 1527, 1530 (11th Cir. 1994); see also Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984).  A settlement is fair, reasonable, and adequate when "the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." In re Lorazepam & Clorazepate Antitrust Litig., MDL No. 1290, 2003 WL 22037741, at *2 (D.D.C. June 16, 2003) (quoting Manual for Complex Litigation (Third) § 30.42 (1995)).  Importantly, the Court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered

17

from victory at trial." In re Mexico Money Transfer Litig., 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (citations omitted).

The Eleventh Circuit has identified six factors to be considered in analyzing the fairness, reasonableness, and adequacy of a class settlement under Rule 23(e):

(1)    the existence of fraud or collusion behind the settlement;

(2)    the complexity, expense, and likely duration of the litigation;

(3)    the stage of the proceedings and the amount of discovery completed;

(4)    the probability of the plaintiffs' success on the merits;

(5)    the range of possible recovery; and

(6)    the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement.

Leverso, 18 F.3d at 1530 n.6; see also Bennett, 737 F.2d at 986. The analysis of these factors set forth below shows this Settlement to be eminently fair, adequate, and reasonable.

### 1.    There Was No Fraud or Collusion.

The sharply contested nature of the proceedings in this Action demonstrates the absence of fraud or collusion behind the Settlement. See, e.g., Ingram v. Coca-Cola Co., 200 F.R.D. 685, 693 (N.D. Ga. 2001) (court had "no doubt that this case has been adversarial, featuring a high level of contention between the parties"); In

18

re Motorsports Merchan. Antitrust Litig., 112 F. Supp. 2d 1329, 1338 (N.D. Ga. 2000) ("This was not a quick settlement, and there is no suggestion of collusion"); In re Sunbeam Sec. Litig., 176 F. Supp. 2d 1323, 1329 n.3 (S.D. Fla. 2001); Warren v. City of Tampa, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988) (record disclosed no evidence of collusion, but to the contrary showed "that the parties conducted discovery and negotiated the terms of settlement for an extended period of time"), aff'd, 893 F.2d 347 (11th Cir. 1989).

### 2. The Settlement Will Avert Years of Highly Complex and Expensive Litigation.

The claims and defenses are complex; litigating them would be both difficult and time-consuming. Joint Decl. ¶¶ 68-69. Although this Action was litigated for almost two years before the Parties reached an agreement to resolve it, recovery by any means other than settlement would require additional years of litigation. Id. at ¶ 72; see United States v. Glens Falls Newspapers, Inc., 160 F. 3d 853, 856 (2d Cir. 1998) (noting that "a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial"); In re Domestic Air Transp. Antitrust Litig., 148 F.R.D. 297, 317, 325-26 & n.32 (N.D. Ga. 1993) ("adjudication of the claims of two million claimants could last half a millennium").

In contrast, the Settlement provides immediate and substantial benefits to approximately 230,000 Settlement Class Members, all of whom are current or former Woodforest customers.  Joint Decl. ¶¶ 69, 71; Nesbit Aff. ¶ 8.  As stated in In re Shell Oil Refinery, 155 F.R.D. 552 (E.D. La. 1993):

> The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.  In this respect, "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush."

Id. at 560 (alterations in original) (quoting Oppenlander v. Standard Oil Co., 64 F.R.D. 597, 624 (D. Colo. 1974)); see also In re U.S. Oil & Gas Litig., 967 F.2d 489, 493 (11th Cir. 1992) (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive").  Particularly because the "demand for time on the existing judicial system must be evaluated in determining the reasonableness of the settlement," Ressler v. Jacobson, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) (citation omitted), there can be no doubt about the adequacy of the present Settlement, which provides reasonable benefits to the Class.

### 3. The Factual Record Is Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment.

Courts also consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate

appreciation of the merits of the case before negotiating." In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 813 (3d Cir. 1995).   At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." Ressler, 822 F. Supp. at 1555.

Class Counsel settled the Action with the benefit of extensive class and merits-based discovery.   Joint Decl. ¶ 74.   Class Counsel's review of the documents produced positioned them to evaluate with confidence the strengths and weaknesses of Plaintiffs' claims, Woodforest's defenses, and the prospects for success on issues of class certification, preemption, summary judgments and trial. Id.  Prior to settling, Class Counsel developed ample information from which to assess the probability of success, the possible range of recovery, and the likely expense and duration of the litigation.  Id.  Even in the absence of such discovery, Class Counsel are familiar with the practices and likely defenses of banks on these issues through their participation in MDL No. 2036.  "Information obtained from other cases may be used to assist in evaluating the merits of a proposed settlement of a different case." Lipuma, 406 F. Supp. 2d at 1325.

### 4.     Plaintiffs Would Have Faced Significant Obstacles to Prevailing.

The "likelihood and extent of any recovery from the defendants absent . . . settlement" is another important factor in assessing the reasonableness of a settlement. Domestic Air, 148 F.R.D. at 314; see also Ressler, 822 F. Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise").

As the district court recognized in granting final approval to the overdraft fee settlement with Bank of America in MDL 2036: "The combined risks here were real and potentially catastrophic . . . . but for the Settlement, Plaintiffs and the class faced a multitude of potentially serious, substantive defenses, any one of which could have precluded or drastically reduced the prospects of recovery." In re Checking Account Overdraft Litig., 830 F. Supp. 2d 1330, 1347-48 (S.D. Fla. 2011).

Apart from the risks, continued litigation would have involved substantial delay and expense, which further counsels in favor of Final Approval. Given the innumerable risks attending these claims, as well as the certainty of substantial delay and expense from ongoing litigation, the Settlement cannot be seen as anything except a fair compromise. See, e.g., Bennett v. Behring Corp., 96 F.R.D.

343, 349-50 (S.D. Fla. 1982), aff'd, 737 F.2d 982 (11th Cir. 1984) (plaintiffs faced a "myriad of factual and legal problems" creating "great uncertainty as to the fact and amount of damage," making it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confers . . . to the vagaries of a trial").

> **5.    The Benefits Provided by the Settlement Are Fair, Adequate, and Reasonable Compared to the Range of Possible Recovery.**

In determining whether a settlement is fair given the potential range of recovery, the Court should be guided by the principle that "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 542 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990). Indeed, "[a] settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." Id. This is because a settlement must be evaluated "in light of the attendant risks with litigation." Thompson v. Metropolitan Life Ins. Co., 216 F.R.D. 55, 64 (S.D.N.Y. 2003); see also Bennett, 737 F.2d at 986 ("compromise is the essence of settlement"). Thus, courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." Warren, 693 F. Supp. at 1059; see, e.g., Great Neck Capital Appreciation Inv. P'ship, L.P. v. PriceWaterHouseCoopers, L.L.P., 212 F.R.D.

400, 409-10 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement").

Class Counsel have a thorough understanding of the practical and legal issues they would continue to face litigating these claims against Woodforest based, in part, on similar claims challenging high-to-low posting practices prosecuted in In re Checking Account Overdraft Litigation, MDL No. 2036. Joint Decl. ¶ 66.

Through this Settlement, Plaintiffs and the Settlement Class Members have achieved a recovery of approximately forty-nine percent (49%) of the total recoverable damages without any further risk or delay. Joint Decl. ¶¶ 71, 100. The $7,750,000 cash recovery is fair and reasonable given the obstacles confronted and the complexity of the Action, and the significant barriers that stood between the pre-settlement status of the case and final judgment, including the prospect of contested class certification and interlocutory Rule 23(f) appeal of any order granting class certification; motions for summary judgment; trial; and post-trial appeals.   Joint Decl. ¶ 76.   Taking these risks into account, the $7,750,000 Settlement Fund represents an outstanding result. See Declaration of W. Pitts Carr, ¶ 24 (Dkt. No. 81-3) ("Carr Decl."); Joint Decl. ¶ 100. Woodforest's agreement to

24

pay all fees, costs, and expenses of the Notice Administrator and Settlement Administrator further enhance the Settlement. Joint Decl. ¶ 100. The Court finds that this recovery is a significant achievement by any objective measure.

**6.    The Opinions of Class Counsel, the Class Representatives, and Absent Class Members Favor Approval of the Settlement.**

The Court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." Warren, 693 F. Supp. at 1060; see also Domestic Air, 148 F.R.D. at 312-13 ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel'") (citations omitted).

There has been no opposition to the Settlement. As of the April 24, 2014 deadline, only eight (8) Settlement Class Members had requested to be excluded from the Settlement Class. See Second Affidavit of Staci Nesbit, ¶ 8 (Dkt. No. 82-1) ("Second Nesbit Aff."). As of the April 24, 2014 deadline, no Settlement Class Members had objected to the Settlement. Id. at ¶¶ 5-6. While the Court did receive a letter from Timothy and Julie Darling (Dkt. No. 78) that used the word "objection," the Court finds that the Darlings' letter is more akin to a request for

exclusion rather than an objection.  See Second Nesbit Aff. ¶ 5.  This conclusion is supported by the fact that the letter contains none of the information required by the Preliminary Approval Order to be considered a proper objection.  See Dkt. No. 75, ¶ 30.  Even if the Court were to accept the Darlings' letter as an objection, given that the letter fails to substantively challenge any aspect of the Settlement, such an objection would be overruled.

It is settled that "[a] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness." Association for Disabled Americans v. Amoco Oil Co., 211 F.R.D. 457, 467 (S.D. Fla. 2002); also Mangone v. First USA Bank, 206 F.R.D. 222, 227 (S.D. Ill. 2001) ("In evaluating the fairness of a class action settlement, such overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement"); Austin v. Pennsylvania Dep't of Corrs., 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider").  The lack of opposition to the Settlement supports final approval.

## C.     The Settlement Class.

This Court has previously found the requirements of Rules 23(a) and 23(b)(3) satisfied in this Action for purposes of settlement.  See Dkt. No. 75.  The Court hereby reiterates its findings that: (a) the Settlement Class Members are so numerous that joinder of them is impracticable; (b) there are questions of law and fact common to the Settlement Class that predominate over any individual questions; (c) the claims of the Class Representatives are typical of the claims of the Settlement Class; (d) the Class Representatives and Class Counsel fairly and adequately represent and protect the interests of the Settlement Class Members; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the present controversy.

The individuals listed in Exhibit A to the Final Judgment being entered contemporaneously herewith timely elected to opt out of the Settlement.  The Court therefore finds and decrees that they are not part of the Settlement Class, are not bound by the Settlement or release contained therein, and will not receive any distribution from the Settlement Fund.

## D.     The Application for Incentive Awards Is Approved.

Incentive awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action

litigation." Allapattah Servs., Inc. v. Exxon Corp., 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006). "[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action." David v. American Suzuki Motor Corp., 2010 WL 1628362, at *6 (S.D. Fla. Apr. 15, 2010). Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives. See, e.g., Ingram, 200 F.R.D. at 694 (awarding class representatives $300,000 each, explaining that "the magnitude of the relief the Class Representatives obtained on behalf of the class warrants a substantial incentive award"); Spicer v. Chicago Bd. Options Exch., Inc., 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving service awards ranging from $5,000 to $100,000) (awarding $10,000 to each named plaintiff). The factors for determining a service award include: (1) the actions the class representatives took to protect the interests of the class, (2) the degree to which the class benefited from those actions, and (3) the amount of time and effort the class representatives expended in pursuing the litigation. See, e.g., Cook v. Niedert, 142 F.3d 1004, 1016 (7th Cir. 1998).

The two named Plaintiffs provided invaluable assistance to counsel in this litigation by, among other things, submitting to interviews, locating and forwarding

responsive documents, and participating in conferences with Class Counsel.  In so doing, the Plaintiffs were integral to forming the theory of the case.  Joint Decl. ¶¶ 62, 81-85.  The service awards represent much less than one percent of the Settlement Fund, and the amount of the Service Awards is fair and reasonable in view of the efforts of the named Plaintiffs that have greatly benefited the Settlement Class.

The Court finds that the named Plaintiffs/Class Representatives expended substantial time and effort in representing the Settlement Class, and deserve to be compensated for such time and effort on behalf of the Settlement Class.  Therefore, the Court approves the requested service awards of $5,000 for each of the named Plaintiffs/Class Representatives, to be paid from the Settlement Fund.

### E.   Class Counsel's Application for Fees and Expenses Is Granted.

Class Counsel request attorneys' fees equal to thirty-three percent (33%) of the $7,750,000 Settlement Fund created through its efforts.  See Amended Agreement ¶ 109.  The Court analyzes this fee request under Camden I Condominium Ass'n v. Dunkle, 946 F.2d 768 (11th Cir. 1991).  As set forth below, after considering the Camden I factors, the Court concludes the requested fee is appropriate, fair, and reasonable and should be approved.

### 1.    The Law Awards Class Counsel Fees From the Common Fund Created Through Their Efforts.

It is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to attorneys' fees based upon the benefit obtained. Camden I, 946 F.2d at 771; also Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). The common benefit doctrine is an exception to the general rule that each party must bear its own litigation costs. The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts." In re Gould Sec. Litig., 727 F. Supp. 1201, 1202 (N.D. Ill. 1989) (citation omitted). The common benefit doctrine stems from the premise that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. Van Gemert, 444 U.S. at 478. As a result, the Supreme Court and the Eleventh Circuit have recognized that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as whole. Id.; see also Camden I, 946 F.2d at 771 ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval"). Courts have also recognized that

30

appropriate fee awards can encourage redress for wrongs caused to entire classes of persons, and deter future misconduct of a similar nature.  See, e.g., Mashburn, 684 F. Supp. at 687; see also Deposit Guar. Nat'l Bank v. Rope, 445 U.S. 326, 338-39 (1980).  Adequate compensation promotes the availability of counsel for aggrieved persons.

> If the plaintiffs' bar is not adequately compensated for its risk, responsibility, and effort when it is successful, then effective representation for plaintiffs in these cases will disappear . . . .  We as members of the judiciary must be ever watchful to avoid being isolated from the experience of those who are actively engaged in the practice of law.  It is difficult to evaluate the effort it takes to successfully and ethically prosecute a large plaintiffs' class action suit.  It is an experience in which few of us have participated.  The dimensions of the undertaking are awesome.

Muehler v. Land O'Lakes, Inc., 617 F. Supp. 1370, 1375-76 (D. Minn. 1985).

In the Eleventh Circuit, class counsel receives a percentage of the funds obtained through a settlement.  In Camden I – the controlling authority regarding attorneys' fees in common-fund class actions – the Eleventh Circuit held that

> the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case.  Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class.

946 F.2d at 774; <u>also</u> <u>In re Checking Account Overdraft Litig.</u>, 830 F. Supp. 2d at 1362 ("the Eleventh Circuit made clear in <u>Camden I</u> that percentage of the fund is the exclusive method for awarding fees in common fund class actions").

This Court has substantial discretion in determining the appropriate fee percentage. "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." <u>Sunbeam</u>, 176 F. Supp. 2d at 1333 (quoting <u>Camden I</u>, 946 F.2d at 774). Based on the findings below, this Court finds that Class Counsel are entitled to an award of thirty-three percent (33%) of the $7,750,000 Settlement Fund secured through their efforts. This award falls within this accepted range and is in accord with this Court's prior fee rulings. Carr Decl. ¶ 21.

> **2.    Application of the <u>Camden I</u> Factors Supports the Requested Fee.**

The Eleventh Circuit has provided a set of factors the Court should use to determine a reasonable percentage to award class action counsel:

(1)    the time and labor required;

(2)    the novelty and difficulty of the relevant questions;

(3)    the skill required to properly carry out the legal services;

(4)    the preclusion of other employment by the attorney as a

result of his acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the clients or the circumstances;

(8) the results obtained, including the amount recovered for the clients;

(9) the experience, reputation, and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and the length of the professional relationship with the clients; and

(12) fee awards in similar cases.

Camden I, 946 F.2d at 772 n.3 (citing factors originally set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974)).

### a. The Claims Against Woodforest Required Substantial Time and Labor.

Prosecuting and settling the claims in the Action demanded considerable time and labor, making this fee request reasonable. Class Counsel spent a substantial number of hours investigating the claims of many potential plaintiffs against Woodforest and interviewed numerous Woodforest customers and potential plaintiffs to gather information about Woodforest's conduct and its effect on consumers. Joint Decl. ¶¶ 88-89. This information was essential to Class

Counsel's ability to understand the nature of Woodforest's conduct, the language of the account agreements at issue, and potential remedies.  Id.

Class Counsel expended significant resources researching and developing the legal theories and claims presented in the complaint and the opposition to the motion to dismiss and motion to strike class allegations.  Joint Decl. ¶ 90.  Once the Court denied Woodforest's motions and opened discovery, Class Counsel served written discovery requests on Woodforest, seeking relevant and probative documents and information in its possession.  Id. at ¶¶ 23-25, 91.  The process of developing, refining, and finalizing such discovery requests – with an eye toward class certification, summary judgment, and trial – required considerable effort.  Id. Woodforest ultimately produced over 79,000 pages of documents in response to Class Counsel's discovery requests.  Id. at ¶ 84.  Class Counsel's review of the documents enabled Plaintiffs to gain an understanding of the evidence related to the central questions in the case.  Id. at ¶ 24.  The review of the documents produced by Woodforest also assisted Class Counsel in understanding some of Woodforest's unique Debit Re-sequencing Overdraft Practices.  Id. at ¶ 25.  Class Counsel also devoted significant time and effort to preparing responses to Woodforest's written discovery requests directed to the Plaintiffs, including requests for production of documents and interrogatories.  Id. at ¶ 20.

34

Woodforest provided Class Counsel with sample transactional data regarding its overdraft fee revenue. Woodforest also provided aggregate information regarding its total overdraft fees during all months of the relevant time period. Joint Decl. ¶ 28. Using the extensive transactional data provided for six randomly selected months during the class period, Class Counsel worked with their expert, Arthur Olsen of Cassis Technology, LLC, to first determine what percentage of the total overdraft fees generated by Woodforest were attributable to the Bank's Debit Re-sequencing Overdraft Practices. Id. at ¶ 29.

After determining what percentage of overdraft fees were allegedly wrongful using the sample transactional data, Class Counsel and Mr. Olsen applied this percentage to the aggregate information regarding Woodforest's total overdraft fee revenue during all months of the relevant time period. Joint Decl. ¶ 30. This calculation allowed Mr. Olsen to determine the amount of damages that allegedly were suffered by the Settlement Class as a result of Woodforest's Debit Re-sequencing Overdraft Practices. Id. at ¶ 31. The data-crunching and analysis performed by Mr. Olsen was an enormous task given the millions of customer transactions that were involved and the numerous internal codes of the Bank. Id.

Settlement negotiations and preparation for mediation consumed further time and resources. Joint Decl. ¶¶ 28-32, 94. The pre-mediation discussions and

35

planning, as well as the mediation session required substantial preparation and follow-up work. Id. at ¶ 94.

After an agreement was reached at mediation, additional negotiations and discussions ensued regarding the comprehensive terms of the Settlement. This work consumed a significant amount of time. Joint Decl. ¶¶ 36, 95. Class Counsel's work paid dividends for the Settlement Class. Each of the above-described efforts was essential to achieving the Settlement before the Court. Id. at ¶ 96.

In sum, the time and resources Class Counsel devoted to prosecuting and settling this Action readily justify the requested fee. See Carr Decl. ¶ 13.

> **b.     The Issues Involved Were Novel and Difficult, and Required the Skill of Highly Talented Attorneys.**

Class Counsel have conferred a significant benefit on the Settlement Class in the face of daunting litigation obstacles. It required the acquisition and analysis of large amounts of bank data – and the efforts of a highly skilled expert. Joint Decl. ¶ 97. Litigation of a case like this requires counsel highly trained in class action law and procedure as well as the specialized issues these cases present. Id. at ¶ 98. Class Counsel possess these attributes, and their contributions added value to the representation of this Settlement Class consisting of over 200,000 customers. Id.

The novelty and difficulty of the issues involved created significant risk for Class Counsel. The risks were not merely one, but several. The first risk involved federal preemption, specifically Woodforest's argument that the National Bank Act ("NBA") permitted national banks to post items in any manner they chose. See Carr Decl. ¶ 14; Motion to Dismiss, p. 31 n.35 (noting Woodforest's intent to assert federal preemption defense).

Another difficult question generating significant risk for Class Counsel involved Woodforest's anticipated argument that it had disclosed to its customers the very practice that the class alleged was unlawful. Carr Decl. ¶ 14. Woodforest had a colorable argument that its customers were aware and had consented to the challenged practice of posting debits and withdrawals from highest to lowest dollar amount. Joint Decl. ¶ 104 (discussing two such examples). This was a significant risk that Class Counsel undertook when accepting this representation. Id.; Carr Decl. ¶ 14.

In evaluating the quality of representation by Class Counsel, the Court should also consider the quality of opposing counsel. See Camden I, 946 F.2d at 772 n.3; Ressler, 149 F.R.D. at 654. Throughout the litigation, Woodforest was represented by extremely capable counsel. They were worthy, highly competent and professional adversaries. Joint Decl. ¶ 99; see also In re Checking Account

37

Overdraft Litig., 830 F. Supp. 2d at 1348 (finding "Class Counsel confronted not merely a single large bank, but the combined forces of a substantial portion of the entire American banking industry, and with them a large contingent of some of the largest and most sophisticated law firms in the country") (internal quotation marks and citation omitted); Walco Invs. v. Thenen, 975 F. Supp. 1468, 1472 (S.D. Fla. 1997) (stating that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results").  Indeed, the firms and attorneys which worked for Woodforest had worked for at least four other banks in the Overdraft MDL, Bank of America, Regions, BB&T, and BancorpSouth.  They had enormous resources and experience to draw from in defending the Bank.

### c.    Class Counsel Achieved an Excellent Result.

Given the significant litigation risks faced by the Settlement Class here, the Settlement represents an extraordinary result.  Carr Decl. ¶ 24.  Rather than facing more years of costly and uncertain litigation, the Settlement Class Members will receive an immediate cash benefit.  Joint Decl. ¶ 100.  The Settlement Fund will not be reduced by costs of Notice or Settlement administration; such expenses have been and will continue to be borne separately by Woodforest.  Amended Agreement ¶¶ 57, 63; Joint Decl. ¶ 100.  Moreover, the payments to the Settlement

Class will be forthcoming automatically, through direct deposit or checks. Amended Agreement ¶ 94; Joint Decl. ¶ 100.

### d.    The Claims Presented Serious Risk.

The Settlement here is particularly noteworthy given the combined litigation risks. Consideration of the "litigation risks" factor under <u>Camden I</u>

> recognizes that counsel should be rewarded for taking on a case from which other law firms shrunk. Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny factual circumstances, or the possible financial outcome of a case. All of this and more is enveloped by the term 'undesirable.'

<u>Sunbeam</u>, 176 F. Supp. 2d at 1336.

Further, "[t]he point at which plaintiffs settle with defendants . . . is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them." <u>Skelton v. General Motors Corp.</u>, 860 F.2d 250, 258 (7th Cir. 1988). "Undesirability" and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit – not retroactively, with the benefit of hindsight. <u>Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.</u>, 540 F.2d 102, 112 (3d Cir. 1976); <u>Walco</u>, 975 F. Supp. at 1473.

Prosecuting the Action was risky from the outset. It was questionable whether the bulk of the claims would ultimately be upheld against attack, and it

was uncertain whether a large, multistate class would be certified and successfully withstand appellate review.  Joint Decl. ¶ 101.  Woodforest mounted vigorous defenses to these claims, denying any and all liability.  Id.  Certification of the large multistate class, consisting of current and former customers representing seventeen (17) states, could be denied for a variety of reasons.  Id.; also Carr Decl. ¶ 14.

Given these risks, the $7,750,000 cash recovery obtained through the Settlement is remarkable.  These risks could easily have impeded, if not altogether derailed, Plaintiffs' and the Settlement Class' successful prosecution of these claims at trial and in an eventual appeal.  The Settlement is an extremely fair and reasonable recovery for the Class in light of Woodforest's defenses, and the challenging and unpredictable path of litigation Plaintiffs would have faced absent the Settlement.

> **e.      Class Counsel Assumed Considerable Risk to Pursue This Action on a Pure Contingency Basis, and Were Precluded From Other Employment as a Result.**

In undertaking to prosecute this complex case entirely on a contingent fee basis, Class Counsel assumed a significant risk of nonpayment or underpayment. Joint Decl. ¶ 106.  That risk warrants an appropriate fee.  Indeed, a "contingency fee arrangement often justifies an increase in the award of attorney's fees."

Sunbeam, 176 F. Supp. 2d at 1335 (quoting Behrens, 118 F.R.D. at 548); see also In re Continental Ill. Sec. Litig., 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent-fee basis, plaintiffs' counsel must be adequately compensated for the risk of non-payment); Ressler, 149 F.R.D. at 656 ("Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award").

Public policy concerns – in particular, ensuring the continued availability of experienced and capable counsel to represent classes of injured plaintiffs holding small individual claims – support the requested fee. Joint Decl. ¶ 107; Carr Decl. ¶¶ 16, 18. As one court noted:

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. . . . A contingency fee arrangement often justifies an increase in the award of attorney's fees. This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

Behrens, 118 F.R.D. at 548.

The progress of the Action shows the inherent risk faced by Class Counsel in accepting these cases on a contingency-fee basis. Despite Class Counsel's effort in litigating this Action for over two years, they remain completely uncompensated

for the time invested in the Action, in addition to the expenses advanced.  Joint Decl. ¶ 108. There can be no dispute that this case entailed substantial risk of nonpayment for Class Counsel.

> **f.    The Requested Fee Comports With Fees Awarded in Similar Cases.**

The fee sought here is in line with fees typically awarded in similar cases. Carr Decl. ¶ 23; Joint Decl. ¶ 110.  Many decisions have found that a one-third fee is well within the range of a customary fee.  Indeed, several decisions within this district have awarded attorneys' fees of one-third (33.33%), confirming the reasonableness of the slightly lower fee requested here.  E.g., In re Profit Recovery Group Int'l, Inc. Sec. Litig., Civil Action No. 1:00-cv-1416-CC (N.D. Ga. May 26, 2005) (Cooper, J.) (awarding 33.33% of $6.75 million settlement fund plus interest and expenses); In re Clarus Corp. Sec. Litig., Civil Action No. 1:00-cv-2841-CAP (N.D. Ga. Jan. 6, 2005) (Pannell, J.) (awarding 33.33% of $4.5 million settlement fund plus interest and expenses); In re Medrisk, Inc. Sec. Litig., Civil Action No. 1:98-cv-1922-CAP (N.D. Ga. Mar. 22, 2004) (Pannell, J.) (awarding 33.33% of $4.0 million settlement fund plus reimbursement of expenses); In re Pediatric Servs. of Am., Inc. Sec. Litig., Civil Action No. 1:99-cv-0670-RLV (N.D. Ga. Mar. 15, 2002) (Vining, J.) (awarding 33.33% of $3.2 million settlement fund plus interest and expenses); In re Harbinger Corp. Sec. Litig., Civil Action No. 1:99-cv-

2353-MHS (N.D. Ga. Oct. 18, 2001) (Shoob, J.) (awarding 33.33% of settlement fund plus interest and expenses); see also Waters v. International Precious Metals Corp., 190 F.3d 1291, 1297-98 (11th Cir. 1999) (affirming fee award of 33.33% on settlement of $40 million).

Courts from other jurisdictions also award fees in common fund cases in excess of thirty-three percent (33%). E.g., Gaskill v. Gordon, 942 F. Supp. 382, 387-88 (N.D. Ill. 1996), aff'd, 160 F.3d 361 (7th Cir. 1998) (finding that 33% is the norm, and awarding 38% of settlement fund); In re Combustion, Inc., 968 F. Supp. 1116, 1136-41 (W.D. La. 1997) (36%); In re Crazy Eddie Sec. Litig., 824 F. Supp. 320, 326 (E.D.N.Y. 1993) (33.8%); In re Ampicillin Antitrust Litig., 526 F. Supp. 494, 498 (D.D.C. 1981) (45%); Beech Cinema, Inc. v. Twentieth-Century Fox Film Corp., 480 F. Supp. 1195, 1199 (S.D.N.Y. 1979), aff'd, 622 F.2d 1106 (2d Cir. 1980) (approximately 53%); In re Relafen Antitrust Litig., No. 01-12239-WGY (D. Mass. Apr. 9, 2004) (33.33%); Zinman v. Avemco Corp., 1978 WL 5686 (E.D. Pa. Jan. 18, 1978) (Higginbotham, J.) (50%).

Class Counsel's fee request falls within the range of the private marketplace, where contingency-fee arrangements are often between 30 and 40 percent of any recovery. Carr Decl. ¶ 17; In re Public Serv. Co. of N.M., 1992 WL 278452, at *7 (S.D. Cal. July 28, 1992) ("If this were a non-representative litigation, the

customary fee arrangement would be contingent, on a percentage basis, and in the range of 30% to 40% of the recovery"). The record here leaves no doubt that Class Counsel's fee request is appropriate and comports with attorneys' fees awarded in similar cases.

### g. The Remaining Camden I Factors Also Favor Approving the Requested Fee.

The remaining Camden I factors likewise support granting Class Counsel's fee request. "Class Counsel's experience in complex and sophisticated class action litigation was likely essential in reaching the result [] achieved here." Carr Decl. ¶ 15. "Had they not had the skill to perform the necessary services, it is doubtful they could have achieved the results obtained in this case." Id. Moreover, without adequate compensation and financial reward, cases such as this simply could not be pursued. Id. at ¶¶ 14, 18. The factual record in this case and the Court's own observations compel the fee award requested in this case.

While the Court awards Class Counsel attorneys' fees in the amount of thirty-three percent (33%) of the $7,750,000 Settlement Fund secured through their efforts, the Court notes that under the Amended Agreement, this case does not conclude with this final approval order. Any uncashed or returned checks will remain in the Settlement Fund for one year from the date the first distribution check is mailed by the Settlement Administrator, during which time the Settlement

Administrator will make reasonable efforts to effectuate delivery of the Settlement Fund Payments. See Amended Agreement ¶ 98. Furthermore, any monies remaining in the Settlement Fund after that time are required to be disbursed according to Section XIV of the Amended Agreement. In order to ensure an expeditious and orderly distribution of any residual monies in the Settlement Fund, the Court orders that twenty percent (20%) of the attorneys' fee award be retained in the Escrow Account by the Settlement Administrator until such time as all residual funds have been disbursed in accordance with Section XIV of the Amended Agreement. At such time, the remaining portion of the fee award shall be released to Class Counsel.

### 3. The Expense Request Is Appropriate.

Finally, the Court finds that Class Counsel's request for reimbursement of $49,158.83 in litigation costs and expenses is reasonable and justified. See Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391-92 (1970). This sum corresponds to certain actual out-of-pocket costs and expenses that Class Counsel necessarily incurred and paid in connection with the prosecution and settlement of the Action. These costs and expenses consist of: (1) $40,700 in fees and expenses for Plaintiffs' expert, Arthur Olsen, whose services were critical in determining the damages for the Settlement Class, in identifying Settlement Class Members, and in

allocating the Settlement Fund; (2) $6,001.33 in mediator's fees and expenses for the services rendered by the mediator in connection with the mediation session; (3) $1,592.47 in necessary travel expenses and (4) $865.03 in necessary filing fees and administrative costs and expenses. Joint Decl. ¶ 112. Accordingly, reimbursement of costs and expenses in the amount of $49,158.83 shall be made from the Settlement Fund following disbursement of attorneys' fees.

## CONCLUSION

For the foregoing reasons, the Court: (1) grants Final Approval to the Settlement; (2) certifies for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e); (3) appoints as class representatives Plaintiffs Erica L. Lunsford and Terry L. Lunsford; (4) appoints as Class Counsel the law firm and attorneys listed in paragraph 23 of the Amended Agreement; (5) approves the requested Service Awards for the named Plaintiffs; (6) awards Class Counsel attorneys' fees and expenses; (7) directs Class Counsel, Plaintiffs, and Woodforest to implement and consummate the Settlement pursuant to its terms and conditions; (8) retains continuing jurisdiction over Plaintiffs, the Settlement Class, and Woodforest to implement, administer, consummate, and enforce the Settlement and this Final Approval Order; and (9) will separately enter Final Judgment dismissing the Action with prejudice.

DONE AND ORDERED this __19th__ day of May, 2014.


/s/Charles A. Pannell, Jr. ____
CHARLES A. PANNELL, JR.
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF GEORGIA

47

## WOODFOREST BANK EXCLUSION REQUESTS

| SEQ | Name1 | Name2 | Exclusion Request Timely |
|---|---|---|---|
| 1 | SHIRLEY A TAYLOR | | Yes |
| 2 | JULIE J DARLING | | Yes |
| 3 | CAMELIA I BASCOM | | Yes |
| 4 | COREY PERSON | | Yes |
| 5 | SHANNON YVONNE STANFORD | | Yes |
| 6 | HEATHER C MATTHEWS | | Yes |
| 7 | JOSHUA MATTHEWS | | Yes |
| 8 | JULIE NOOR | | Yes |